## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

WILLIAM WALLACE; MATT MONTROSS;
BENJAMIN ROBERTS; individually and on
behalf of all others similarly situated,

**Case No.  5:24-cv-00702**

*Plaintiffs*,

**Jury Trial Demanded**

v.

CONTINENTAL AKTIENGESELLSCHAFT;
CONTINENTAL TIRE THE AMERICAS, LLC;
COMPAGNIE GÉNÉRALE DES
ÉTABLISSEMENTS; MICHELIN NORTH
AMERICA, INC.; NOKIAN TYRES PLC;
NOKIAN TYRES INC; NOKIAN TYRES U.S.
OPERATIONS LLC; THE GOODYEAR TIRE
& RUBBER COMPANY; PIRELLI & C. S.P.A.;
PIRELLI TIRE LLC; BRIDGESTONE
CORPORATION; BRIDGESTONE
AMERICAS, INC.; AND DOES 1-100,

*Defendants*.

## CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

**SUMMARY** ........................................................................................................................ **1**

**JURISDICTION AND VENUE** ...................................................................................... **3**

**PARTIES** ........................................................................................................................ **4**

   A.   Plaintiffs ............................................................................................................... 4

   B.   Defendants ............................................................................................................ 4

        *1.*   *Michelin* ..................................................................................................... 5

        *2.*   *Bridgestone* .............................................................................................. 6

        *3.*   *Goodyear* .................................................................................................. 6

        *4.*   *Continental* .............................................................................................. 7

        *5.*   *Pirelli* ....................................................................................................... 8

        *6.*   *Nokian Tyres* ........................................................................................... 9

        *7.*   *Doe Defendants* ...................................................................................... 10

   C.   Agents and Unnamed Co-Conspirators ............................................................ 10

**FACTUAL ALLEGATIONS** ........................................................................................ **11**

   A.   Industry Background .......................................................................................... 11

   B.   The Pandemic disrupted the market for Tires. .................................................. 13

   C.   Defendants drastically increased prices during the Class Period ...................... 14

        *1.*   *Prices rose substantially after being stable for a long period of time.* ............................ 14

        *2.*   *Defendants made public announcements signaling their price increases.* ....................... 17

        *3.*   *Defendants tracked their competitors' pricing.* .................................. 22

        *4.*   *Defendants had opportunities to collude at industry events.* .............. 25

        *5.*   *Supply Coordination* ............................................................................ 28

   D.   Market Conditions for Tires Are Highly Conducive to Collusion Among Defendants. ...... 29

        *1.*   *There are high barriers to entry.* ......................................................... 29

        *2.*   *There is inelastic consumer demand for tires.* .................................... 30

        *3.*   *The market for tires manufacturers is highly concentrated.* ............... 31

        *4.*   *The market of tire purchasers is unconcentrated.* .............................. 33

        *5.*   *There were numerous opportunities for Defendants to collude.* .......... 33

        *6.*   *Tires are standardized products with a high degree of interchangeability* ...................... 34

   E.   Antitrust Investigations Support the Existence of a Conspiracy. ...................... 35

   F.   Defendants Are Repeat Violators of Antitrust Laws. ........................................ 35

   G.   Defendants Fraudulently Concealed Their Conduct. ......................................... 37

**CLASS ACTION ALLEGATIONS** .............................................................................. **38**

**INTERSTATE TRADE AND COMMERCE**..................................................................**40**

    ANTITRUST INJURY ............................................................................................41

**CLAIMS FOR RELIEF** ...............................................................................................**43**

    Count 1: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)................................................................................................43

    Count 2: Violation of State Antitrust Statutes .....................................................44

    Count 3: Violation of Consumer Protection Statutes..........................................57

**PRAYER FOR RELIEF**...............................................................................................**74**

**JURY DEMAND** ..........................................................................................................**75**

Plaintiffs William Wallace, Matt Montross, and Benjamin Roberts ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to federal and state antitrust and consumer protection laws and demands a trial by jury on all matters so triable.

## SUMMARY

1.      Beginning no later than January 1, 2020, and continuing until the effects of their anticompetitive conduct have ceased (the "Class Period"), Defendants conspired to fix, raise, maintain, or stabilize prices for new replacement tires for passenger cars, SUVs, vans, trucks, and buses (collectively, "Tires") sold in the United States.

2.      Defendants are some of the largest tire manufacturers in the United States and around the world, and control nearly two-thirds of the global and U.S. markets for Tires.

3.      Defendants generate billions of dollars in Tire sales annually. Generally, demand for Tires depends on the number of total miles driven. "As people travel more, they put more wear and tear on their tires. This increases the demand for both new and replacement tires."[1] Accordingly, miles driven is a useful proxy for Tire demand.

4.      After decades of steady increases, the number of miles driven in the United States plunged dramatically in 2020 during the COVID-19 pandemic.[2] The total miles driven in the US

---

[1] Slowing Down of Tire Demand: an Analysis of the Factors Involved, IndexBox (Jan. 11, 2023), https://www.indexbox.io/blog/global-tyre-market-2023-key-insights/.

[2] Wolf Richter, Miles Driven Eke Out Record after Covid-Plunge: People Drive Less, but there Are More People, Wolf Street (Feb 9, 2024), https://wolfstreet.com/2024/02/09/miles-driven-eke-out-record-in-2023-after-covid-plunge-people-drive-less-but-there-are-more-people/.

fell by almost 200 billion miles and in some areas, traffic volume decreased by almost 40%.[3]



**Miles Driven in the US, Billion Miles per Year**

Source: US Dept. of Transportation          WOLFSTREET.com

5.     As demand for Tires dropped in 2020, investors in the tire industry took note and the stock prices of the publicly traded Tire companies plunged.

6.     Defendants responded by entering an unlawful agreement to fix, raise, or maintain Tire prices. The agreement was effectuated by, among other means, implementing parallel price increases that were signaled during earnings calls and other public statements; using revenue management software to track competitors' information; and participating in annual industry meetings and coordinating supply reductions to keep prices artificially high.

7.     Defendants' scheme worked, and Tire prices began increasing significantly starting around 2021 and have remained elevated.[4]

---

[3] Covid's Impact in the Tire Industry, Service Tire and Truck Centers (Sep. 13, 2023), https://www.sttc.com/covid-impact-tire-industry/.
[4] Michael Grabell, Overinflated: The Journey of a Humble Tire Reveals Why Prices Are Still So High, ProPublica (May 3, 2023), https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices.



8.      On January 30, 2024, the European Commission ("EC") announced dawn raids at the premises of "companies active in the tyres industry in several Member States," which included the Defendants. The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," specifically that price coordination took place amongst these companies.

9.      As a direct result of Defendants' conspiracy, Plaintiffs and the Class purchased Tires from Defendants at artificially inflated prices and were thereby directly injured in their business or property.

10.     Plaintiffs seek to represent a Class of individuals that purchased Tires directly from Defendants at supracompetitive prices to recover damages, injunctive relief, and other relief as is appropriate, based on Defendants violation of federal and state antitrust and consumer protection laws.

**JURISDICTION AND VENUE**

11.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d),

1337(a), and 1367. The Court also has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

12.     This Court has personal jurisdiction over Defendants because they purposefully directed its business activity toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiff's claim for relief arises from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiffs paid unlawful overcharges for Tires and suffered antitrust injury within this jurisdiction.

13.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District. Defendant Goodyear at all relevant times was incorporated under the laws of the State of Ohio.

## PARTIES

### A.     Plaintiffs

14.     Plaintiffs William Wallace is a resident of the District of Columbia, and purchased Tires manufactured by one of Defendants during the class period in the District of Columbia.

15.     Plaintiffs Benjamin Roberts is a resident of Minnesota, and purchased Tires manufactured by one of Defendants during the class period in Minnesota.

16.     Plaintiffs Matt Montross is a resident of Oregon, and purchased Tires manufactured by one of Defendants during the class period in Oregon.

17.     During the Class Period, Plaintiffs purchased Tires in the United States or its territories at supra-competitive prices indirectly from one or more of the Defendants.

### B.     Defendants

### *1. Michelin*

18.　　Defendant Compagnie Générale des Établissements ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries.[5]

19.　　CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly-owned subsidiary that coordinates all of the Group's manufacturing, sales and research operations in France and Compagnie Financière Michelin ("CFM"), a wholly-owned subsidiary that owns most of the Group's manufacturing, sales and research companies outside of France and coordinates their operations.[6]

20.　　Defendant Michelin North America, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at One Parkway South, Greenville, SC 29615-5022.

21.　　These various companies will be referred to collectively as "Michelin" throughout the complaint.

22.　　Michelin designs, manufactures, and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm equipment, heavy-duty trucks, and motorcycles.[7] Michelin is one of the leading manufacturers of tires in the United States. In 2022, Michelin generated roughly $9 billion in in the United States.[8] Michelin employs 23,000

---

[5] Michelin 2022 Universal Registration Document, at pg. 403.
[6] *Id.*
[7] U.S. Tire Manufacturers Association, https://www.ustires.org/michelin-north-america-inc (last visited Mar. 29, 2024).
[8] Michelin 2022 Universal Registration Document, at pg. 14.

people across 34 plants in the United States and Canada.[9] Michelin has manufacturing facilities in, inter alia, Alabama (light trucks and passenger tires), Indiana (car tires), Oklahoma (passenger tires), and South Carolina (passenger tires and truck and bus tires).

### 2. Bridgestone

23.     Bridgestone Defendant Bridgestone Corporation is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and Bridgestone Japan ("BSJP").

24.     Defendant Bridgestone Americas, Inc. ("BSAM") is incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee, 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries.[10] BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.[11]

25.     These companies will collectively be referred to as "Bridgestone" throughout the complaint. Bridgestone is the world's largest tire and rubber company.

### 3. Goodyear

26.     Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a corporation

---

[9] MNA Fact Sheet 2023, Michelin Media, https://michelinmedia.com/site/user/files/1/MNA-Fact-Sheet-2023_2.pdf (last visited Mar 29. 2024).
[10] U.S. Tire Manufacturers Association, https://www.ustires.org/bridgestone-americas-inc (last visited Mar. 29, 2024).
[11] *Id.*

organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way Akron, Ohio 44316-0001. Goodyear is one of the world's leading tire companies, with one of the most recognizable brand names. It develops, manufactures, markets, and distributes a "wide range of tires for consumers all over the world."[12]

27.     Through its worldwide network of aligned dealers and wholesale distributors and its own retail outlets and commercial truck centers, Goodyear offers its products for sale to consumer and commercial customers, along with repair and other services. Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft and Roadmaster brands.[13] Approximately 86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire units.[14]

### 4. Continental

28.     Defendant Continental Aktiengesellschaft ("Continental)," is a German company with its headquarters at Vahrenwalder Strasse 9, 30165 Hannover, Germany. Continental AG has four group sectors: Automotive, Tires, ContiTech, and Contract Manufacturing.[15] The Tires group has five business areas: (i) Original Equipment, (ii) Replacement APAC, (iii) Replacement EMEA, (iv) Replacement the Americas, and (v) Specialty Tires.[16]

29.     In its 2022 Annual Report, Continental reported that its "Tires group sector achieved a particularly positive result, even surpassing expectations with an adjusted EBIT margin of 13.1 percent."[17] In 2022, Continental reported sales of €14 billion globally for its tire

---

[12] Goodyear Corporate, https://corporate.goodyear.com/us/en/about.html (last visited Mar. 29, 2024).

[13] Form 10-K for Goodyear Tire Rubber CO OH filed 02/13/2023, Goodyear Tires Global Contract Solution, https://goodyear.gcs-web.com/static-files/7ebb1867-1e25-49d8-98a1-b60e30bb1296 (last visited Mar. 29, 2024).

[14] Id.

[15] Continental 2022 Annual Report, pg. 26, Continental AG, https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf (last visited Mar. 29, 2024).

[16] *Id.* at 75.

[17] *Id.*

group.[18] Continental's tire group boasts 56,987 employees worldwide.[19]

30.     In the Tires group sector, sales to dealers and end users represent the largest share of the tire-replacement business.[20] For the Tires group sector, economies of scale are important drivers of profitability. For that reason, "manufacturing takes place at major locations in the dominant automotive markets, namely Europe, the U.S., and China."[21]

### 5. Pirelli

31.     Defendant Pirelli & C. S.p.A. is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli designs, manufactures, and distributes tires for cars, motorcycles, and bicycles. Pirelli focuses its business on the high end, premium product segment where it is a world leader. Pirelli has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.

32.     Defendant Pirelli Tire LLC is a foreign limited liability company organized under the laws of Delaware with its principal place of business located at 100 Pirelli Drive Rome, GA 30161. Pirelli Tire LLC has sales and marketing offices in New York City, Los Angeles, Detroit, Montreal and Atlanta, and a prestige flagship store in Los Angeles. The company manufactures, distributes, and markets original equipment and replacement tires for export and domestic car/motorcycle applications.

33.     All Pirelli companies will be referred to collectively as "Pirelli" throughout the complaint.

### 6. Nokian Tyres

34.     Defendant Nokian Tyres plc is organized under the laws of Finland with its

---

[18] *Id.*
[19] *Id.*
[20] *Id.* at 26.
[21] *Id.* at 28.

principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres

plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide.

These companies will collectively be referred to as "Nokian" throughout the complaint. Nokian

develops and manufactures tires for passenger cars, trucks, and heavy machinery. In 2019, the

company's net sales were $1.8 billion, and it employed some 4,700 people.

35.     Defendant Nokian Tyres Inc. is a corporation organized under the laws of the

State of Delaware. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an

indirect subsidiary of Nokian Tyres plc. In December of 2018, Nokia Tyres announced its new

headquarters located at 501 Union Street in Nashville, Tennessee, which would house Nokia

Tyres' Vice President, along with members of the company's sales, customer service, IT,

logistics, finance, and marketing teams.[22] In 2017, Nokian Tyres announced it had opened a

$360 million manufacturing facility located at 520 Nokian Tyres Dr., Dayton, TN, 37321.[23] The

manufacturing facility produces car and light truck all season tires and all-weather tires for

consumers in the United States and Canada.

36.     Defendant Nokian Tyres U.S. Operations LLC is a limited liability company

organized under the laws of the State of Tennessee. It is a fully owned subsidiary of Nokian

Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

37.     These companies will be referred to collectively as "Nokian" throughout the

---

[22] Nokian Tyers Appoints Mr. Mark Earl to Lead the Americas Business Area as of May 1, 2018,
Nokian Tyres (Mar. 16, 2018 3:00 PM), https://www.nokiantyres.com/company/news-
article/nokian-tyres-appoints-mr-mark-earl-to-lead-the-americas-business-area-as-of-may-1-
2018/.; Nokian Tyers Thriving in New Nashville Headquarters, Nokian Tires (Dec. 12, 2018,
4:00 PM), https://www.nokiantires.com/company/news-article/nokian-tyres-thriving-in-new-
nashville-headquarters/.
[23] Associated Press, Nokian Tyres opens $360M tire factory in Tennessee, The Journal Record
(Oct. 3, 2019), https://journalrecord.com/2019/10/nokian-tyres-opens-360m-tire-factory-in-
tennessee/.

Complaint.

### 7. Doe Defendants

38.     DOE Defendants 1–100 are other individuals or entities who engaged in or abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiffs may amend this Complaint to allege the names of additional Defendants as they are discovered.

### C.     Agents and Unnamed Co-Conspirators

39.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or carried out by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

40.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

41.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## FACTUAL ALLEGATIONS

### A.     Industry Background

42.     Tires are a necessary component for passenger and commercial vehicles. There are approximately 286 million vehicles in operation in the US, all of which regularly require replacement Tires.[24]

43.     The United States Tire Manufacturers Association ("USTMA") reported total

---

[24] Number of vehicles in operation in the United States between 1st quarter 2018 and 1st quarter 2023, Statista, https://www.statista.com/statistics/859950/vehicles-in-operation-by-quarter-united-states/ (last visited Mar. 23, 2024).

U.S. Tire shipments of 332 million units in 2019, then a drop to 303 million in 2020, and 316 million units in 2021. Total Tire shipments then jumped back up to around pre-pandemic numbers with 332 million units in 2022 and 334 million units in 2023.[25] [26]

44.     The market for Tires, which had been steadily increasing prior to the pandemic shrunk in 2020, with Defendants shipping 30 million less tires. However, Defendant's revenue jumped almost $10 billion from 2019-2021 despite shipping roughly 16 million less tires.[27]

45.     Furthermore, despite shipping roughly the same number of tires in 2019 as in 2022, Defendants made $18 billion more in 2022.

---

[25] 2023 Tire Shipment Outlook, U.S. Tire Manufacturers, https://www.usTires.org/2023-Tire-shipment-outlook (last visited Mar. 29, 2024).
[26] USTMA Predicts 315.7 Million Tires Will Ship This Year, Modern Tire Dealer (Mar. 1, 2021), https://www.moderntiredealer.com/site-placement/featured-stories/article/11473827/ustma-predicts-3157-million-tires-will-ship-this-year-2021-03-01
[27] Size of the United States' (U.S.) replacement tire market from 2016 to 2023, by segment, Statista, https://www.statista.com/statistics/581639/size-of-the-pneumatic-tire-market-in-the-us/#:~:text=In%202022%2C%20the%20U.S.%20market,over%2061%20billion%20U.S.%20dollars (last visited Mar. 29, 2024).



46.     Each of the Defendants sells billions of dollars of tires in the United States each year. Michelin reported over $8.7 billion worth of sales in the United States in 2022, an increase from the $6.7 billion in 2021.[28] Goodyear reported $10.7 billion of sales in the U.S. in 2022 increasing from $8.5 billion in 2021.[29] While Continental does not break out sales for the U.S. specifically, it reported tire sale revenue of $4.4 billion (€4.2 billion) in North America in 2022.[30] Likewise, Bridgestone does not break out its U.S. sales, but reported $15 billion (¥1.99 trillion) in sales to the Americas in 2022.[31] Pirelli reported $1.7 billion (€1.6 billion) in sales in North

---

[28] Michelin, Results 2022, at 64.
[29] Goodyear, 2022 Annual Report at 59, https://corporate.goodyear.com/content/dam/goodyear-corp/documents/annualreports/2022%20Annual%20Report.pdf (last visited Mar. 29, 2024).
[30] Continental, 2022 Annual Report at 149, https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf (last visited Mar. 29, 2024).
[31] Bridgestone Data 2024, at 6,

America in 2022.[32] Nokian reported net sales of $331.3 million (€314.6 million) in the Americas

in 2022.[33]

| North American tire sales[1] (in millions of dollars) | 2022 | 2021 | 2020 |
|---|---|---|---|
| Michelin North America Inc. | $11,485 | $9,845 | *$8,250 |
| Bridgestone Americas Inc. | *$11,350 | *$9,650 | *$7,850 |
| Goodyear Tire & Rubber Co.[2] | *$10,810 | *$8,430◎ | *$5,335◎ |
| Continental Tire the Americas | $4,415 | $3,775 | *$2,900 |
| Toyo Tire (USA) Corp.[3] | $2,440 | $1,875 | *$1,525 |
| Yokohama Tire Corp. | $2,128 | $1,675 | *$1,200 |
| Hankook Tire America Corp. | $1,888 | $1,640 | *$1,400 |
| Pirelli Tire North America | $1,674◎ | $1,516◎ | *$950 |
| Sumitomo Rubber Industries Ltd.[4] | $1,635 | $1,585 | *$1,375 |
| Kumho Tire USA | $1,125◎ | $570◎ | $445 |
| *Cooper Tire & Rubber Co.[2,5]* | <> | *$935 | *$2,075 |
| Giti Tire | *$625 | *$575 | *$500 |
| Titan Wheel International Inc. | *$575◎ | *$450◎ | *$325◎ |
| Nexen Tire | $552 | $510◎ | *$450 |
| Cheng Shin/Maxxis International | $480 | $435 | *$425 |
| OTHERS: | *$8,000 | *$6,500 | *$5,000 |
| TOTAL (rounded) | *$59,200 | *$50,000 | *$40,000 |

\* estimated   ◎ = revised from previous charts
1 — Tire manufacturers' sales; excludes vehicle service revenue from 'captive' retail operations.
2 — 2021 figure includes 7 months of Cooper Tire & Rubber reve-
nue; 2022 figure includes 12 months of Cooper Tire revenue.
3 — Includes Nitto Tire.
4 — Includes estimates for Sumitomo Tire & Falken Tire Corp.
5 — Cooper Tire figures included for historical relevance.

**B.**     **The Pandemic disrupted the market for Tires.**

47.     The steadily rising number of total vehicle miles and therefore increasing demand

for Tires in the United States combined with the low price of rubber created healthy operating

conditions for tire manufacturers leading up to the outbreak of COVID-19. But as measures were

put into place to combat the spread of the virus, domestic travel dropped significantly which

reduced demand for Tires, with a 13% reduction in the amount of driving and a 23% decline in

---

https://www.bridgestone.com/corporate/library/data_book/pdf/BSDATA2024.pdf (last visited Mar. 29, 2024).
[32] Pirelli, Annual Report 2022, at 72,
https://corporate.pirelli.com/var/files2022/EN/PDF/PIRELLI_ANNUAL_REPORT_2022_ENG.pdf (last visited Mar. 29, 2024).
[33] Nokian, Financial Review 2022 at 8,
https://www.nokiantires.com/company/publications/annual-reports/ (last visited Mar. 29, 2024).

replacement tire rates.[34]

48.     In March of 2020, Goodyear's stock dropped almost 50% of its value. Bridgestone lost around 20% of its value, and Michelin lost around 25% of its value.

49.     Normally, a large drop in demand would lead to decreased prices. However, as detailed below, Defendants all increased their prices repeatedly starting in early 2021 in a collective effort to make up for COVID-inflicted operating losses.

**C.      Defendants drastically increased prices during the Class Period.**

**1. Prices rose substantially after being stable for a long period of time.**

50.     For most of the 2010s, the prices for Tires were stable, changing only by small amounts slowly. Over the last four years, however, the prices of Tires have dramatically increased by over 28%.[35]

51.     During the class period, Defendants have engaged in aggressive and systematic price increases in the Tires market: announcing at least 32 price increases between Bridgestone, Goodyear, Michelin, Pirelli, and Continental between February 1, 2021, and January 15, 2023.

---

[34] Effects of Pandemic Bring Tire Industry to Slow Roll, J.D. Power Finds, Business Wire (Mar. 18, 2021), https://apnews.com/article/business-consumer-products-and-services-diseases-and-conditions-retail-and-wholesale-Tire-retail-3f5b8d0a8eef411bbe57549ee4f911a1.

[35] U.S. Bureau of Labor Statistics, Producer Price Index by Industry: Tire Manufacturing, Except Retreading: Pneumatic Tires (Including Passenger, Truck, Bus, Tractor, Industrial, and Other Tires) [PCU3262113262110], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/PCU3262113262110, February 7, 2024.

| Defendant | Effective Date | Price Increase |
|---|---|---|
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |
| Pirelli | October 1, 2021 | Up to 8% |
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up 10% |

52.     ProPublica reported in March 2023 that "[t]he average price of tires has risen 21.4% over the past two years, more than 70% higher than core inflation. A tire that previously cost $100 might now cost $120; one that was $250 might be $300. That's not counting labor, and people often have to buy more than one tire."[36]

53.     Defendants' price increases cannot be explained away by simply saying they were passing along increased costs to consumers because the increase in prices were disproportionate to Defendants' increased costs. For example, in its Q1 2022 earnings call on

---

[36] Michael Grabell, Overinflated: The Journey of a Humble Tire Reveals Why Prices Are Still So High, ProPublica (May 3, 2023), https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices.

May 6, 2022, Goodyear's Chief Financial Officer told investors "[Goodyear's] increase in the replacement tire prices more than offset [its] costs."[37]

54.     Sales volume also did not suffer due to price increases, which would normally be seen in a competitive market. For example, Continental's sales volume rose by 19.3% in 2022. Its annual report from that year indicates "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."[38]

55.     Bridgestone had a double digit increase in sales in the first quarter of 2022, generating a 26% revenue jump. Despite this financial performance, Bridgestone raised its prices in July of 2022, its third price increase that year. When discussing the price increases, Scott Damon, the COO of Bridgestone America, noted that consumers "remain undeterred, at least for the time being. 'We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong,' he said. 'It is a pleasant surprise.'"[39]

56.     By 2023, inflation had eased, COVID-era supply chain logistics problems were long over, and Tire inventory was up. For example, in November 2023, the President of the union at the Bridgestone Americas Inc. tire plant in Morrison, Tennessee stated that "Even with [] lower production levels, we still have huge amounts of inventory — more than our warehouse can handle. Our warehouse is full of truck and bus tires. In addition, we have 150 to 175 trailers

---

[37] The Goodyear Tire & Rubber Company (GT) Q1 2022 Earnings Call Transcript, AlphaStreet (May 6, 2022), https://news.alphastreet.com/the-goodyear-tire-rubber-company-gt-q1-2022-earnings-call-transcript/
[38] Continental 2022 Annual Report, pg. 73, Continental AG, https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf (last visited Mar. 29, 2024)
[39] Bridgestone fully recovered from cyber breach _ Tire Business (June 2022)

on our plant's property that are completely full of tires."[40]

57.    In a normal competitive market, as costs decreased and supply outpaced demand, prices would drop. However, prices have remained at supercompetitive levels well after the shocks from the pandemic subsided.

### 2. Defendants made public announcements signaling their price increases.

58.    Defendants signaled price increases and production limitations through public announcements and statements on earnings calls.  These price increases were frequent, with multiple defendants  often announcing price increases of similar size around the same time (as shown in the figure below). Continental announced six price increases during this time period but the size of the increases was undisclosed.[41]

---

[40] Joy Kopcha, Do Tire Tiers Exist, and Are They Competitive?, Modern Tire Dealer (Nov. 7, 2023) https://www.moderntiredealer.com/suppliers/article/33014539/do-tire-tiers-exist-and-are-they-competitive.
[41] This graph is based on Defendant's announced price increases detailed and cited below. It is a demonstrative to show the synchronicity of the timing and relative size of the various announced increases.



59.     The coordinated price increases for Tires started in or around December 2020 when Michelin announced an increase of 5% "due to changing business dynamics in the U.S. market" that would take effect February 1, 2021.[42] During an earnings call for Nokian's 2020 Financial Statement Release, Teemu Kangas-Karki, the Vice Chair of the Board of Director, admitted that "there was clear pressure to increase prices."[43] A month later Continental announced its own price hike effective March 1, 2021.[44]

60.     Two and a half months after announcing its first price hike, Michelin announced

---

[42] Motor Tire Dealer, Michelin Will Raise Consumer, Commercial Prices on Feb. 1 (Dec. 19, 2020), https://www.modernTiredealer.com/topic-category/topics/article/11475158/michelin-will-raise-consumer-commercial-prices-on-feb-1-2020-12-19.
[43] Transcription Nokian Tyers Q4 2022, Nokian Tyers (Feb. 7, 2021), https://nokiantyres.studio.crasman.fi/pub/web/attachments/interim_reports/Transcription%20No kian%20Tyres%20Q4%202022.pdf.
[44] Continental Plas Price Hike on PLT Tires, Motor Tire Dealer (Jan. 6, 2021), https://www.modernTiredealer.com/topics/industry-news/article/11474953/continental-plans-price-hike-on-plt-Tires-2021-01-06.

an 8% price increase.[45] Two days later, Goodyear's announced that it would also raise prices 8%.[46] Less than a week later, Pirelli announced a price increase of 7%.[47] Rounding out the month of March, Bridgestone announced a price increase of 8% on March 24, 2021 to be effective on May 1.[48]

61.     The price announcements continued rolling out. On May 3, 2021, Goodyear announced another 8% price hike.[49] Two days later, Continental announced that it would raise prices.[50] Within a few weeks, Pirelli again announced another price hike of 6% to be effective on July 1.[51]

62.     Price increase announcements kept coming throughout 2021. On August 3, Michelin announced an 8% price increase to begin September 1.[52] That same day, Nokian announced that in anticipation of raw material prices that may or may not actually materialize,

---

[45] Michelin Will Raise Consumer Tire Prices on April 1, Motor Tire Dealer (Mar. 1, 2021), https://www.modernTiredealer.com/topic-category/topics/article/11473824/michelin-will-raise-consumer-Tire-prices-on-april-1-2021-03-01.
[46] Goodyear to Increase Consumer Tire Prices, Motor Tire Dealer (Mar. 3, 2021), https://www.modernTiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-Tire-prices-2021-03-03.
[47] Pirelli Will Raise Prices in U.S. on April 15, Motor Tire Dealer (Mar. 9, 2021), https://www.modernTiredealer.com/topic-category/topics/article/11473594/pirelli-will-raise-prices-in-us-on-april-15-2021-03-09.
[48] Bridgestone to Raise Consumer Tire Prices on May 1, Motor Tire Dealer (Mar. 24, 2021), https://www.modernTiredealer.com/site-placement/featured-stories/article/11473222/bridgestone-to-raise-consumer-Tire-prices-on-may-1-2021-03-24.
[49] Goodyear Plans Another Consumer Tire Price Hike, Motor Tire Dealer (May 3, 2021), https://www.modernTiredealer.com/topics/industry-news/article/11472039/goodyear-plans-another-consumer-Tire-price-hike.
[50] Continental Will Raise Consumer Tire Prices in July, Motor Tire Dealer (May 5, 2021), https://www.modernTiredealer.com/topic-category/topics/article/11471940/continental-will-raise-consumer-Tire-prices-in-july-1-2021-05-05.
[51] Pirelli Plans Another Price Hike, Motor Tire Dealer (May 18, 2021), https://www.modernTiredealer.com/topics/industry-news/article/11471596/pirelli-plans-another-price-hike.
[52] Michelin announces North America price increases, Typepress (Aug. 3, 2021) https://www.tyrepress.com/2021/08/michelin-announces-north-america-price-increases/

it would increase Tire prices for the second time that year.[53] A week later, Goodyear announced price increases for the fourth time in a year.[54] Later that month, Continental announced a third price increase[55] and Pirelli announced a fourth price increase.[56]

63.     Closing out the year, Continental announced price increases that would go into effect in 2022.[57] Michelin announced up to 12% price increases to be effective on January 1, 2022.[58]

64.     Tire manufacturers continued to announce price increases early in 2022. On January 3, Pirelli announced up to 10% increases effective January 17.[59] On March 1, Continental announced price increases.[60] That same day, Michelin announced 5% increases on passenger and light truck replacements Tires and 9% increases on motorcycle Tires.[61] The next

---

[53] 2021 Q2 Interim Report Transcript, pg 3, Nokian (Aug.3, 2021), https://nokiantyres.studio.crasman.fi/pub/web/attachments/interim_reports/Transcript_Nokian%20Tyres_Q22021.pdf.

[54] Ratchet & Wrench, Goodyear and Cooper Consumer Tire Prices are Going Up, Ratchet & Wrench (Aug. 10, 2021), https://www.ratchetandwrench.com/topics/news/article/11463860/goodyear-and-cooper-consumer-Tire-prices-are-going-up-modern-Tire-dealer.

[55] Continental Tire Announces Price Increase, Tire Review (Aug. 30, 2021), https://www.Tirereview.com/continental-Tire-announces-price-increase/

[56] Pirelli raising prices for fourth time in 2021, Rubber News (Aug. 31, 2021), https://www.rubbernews.com/Tire/pirelli-raising-us-Tire-prices-oct-1.

[57] Madeline Winer, Continental Tire Announces Price Increases, Tire Review (Nov. 9, 2021), https://www.Tirereview.com/continental-Tire-announces-price-increase-2/.

[58] Michelin Implements Price Increase Across Passenger rands and Commercial Offers in North American Market, PR Newswire (Dec. 1, 2021), https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html.

[59] Daneille Hess, Pirelli Announces Price Increases for Car, Light Truck Tires, Tire Review (Jan. 3, 2022), https://www.Tirereview.com/pirelli-price-increases/.

[60] Christian Hinton, Continental Tire Announces Price Increase, Tire Review (Mar. 1, 2022), https://www.Tirereview.com/continental-Tire-announces-price-increase-3/.

[61] Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market, Michelin Priess Release (Mar. 1, 2022), https://michelinmedia.com/pages/blog/detail/article/c/a1155/#:~:text=Tread%20rubber%20and%20%20associated%20supplies,2%2C%202022.

day, Bridgestone announces a 10% price increase.[62] Later that month, Pirelli announces its own

10% price increase.[63]

65.     Price increases continued through the spring of 2022. In mid-April, Continental

announced another price increase[64] and Nokian announced that it had raised prices in all markets

and would continue to do so.[65] On May 2, Michelin announced increases of 5-12%.[66] The next

month, Goodyear followed with an announcement of price increases up to 10%.[67] Pirelli

announced another price increase of up to 10% on May 17.[68] On June 6, Bridgestone announced

up to 10% price increases.[69]

66.     The next quarter, Bridgestone announced another round of price increases of

15%.[70]

67.     Defendants announced price increases for 2023 in December of 2022. Michelin

announced a 9% increase effective January 1.[71] Bridgestone also announced increased pricing

---

[62] Christian Hinton, Bridgestone Price Increase for Consumer Replacement Tires, Tire Review (Mar. 2, 2022), https://www.Tirereview.com/bridgestone-price-increase-2/.

[63] Christian Hinton, Pirelli Increases Price for Car and Light Truck Tires, Tire Review (Mar. 23, 2022), https://www.Tirereview.com/pirelli-increases-price-for-Tires/.

[64] Conti to raise U.S. Tire prices again, Tire Business (Apr. 19, 2022), https://www.Tirebusiness.com/news/conti-raise-us-Tire-prices-june-1.

[65] Nokian, 2022 Q1 Interim Report Transcript (Apr. 27, 2022), at 3.

[66] Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in Canada and the U.S., Michelin Press Release (May 2, 2022), https://michelinmedia.com/pages/blog/detail/article/c/a1176/#:~:text=GREENVILLE%2C%20S.C.%2C%20May%202%2C,commercial%20products%20and%20service%20offers.

[67] Goodyear to raise North America Tire prices July 1, Tire Business (Jun. 15, 2022), https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[68] Brian Coote, Pirelli to Increase Prices on U.S. PLT Tires, Tire Review (May 17, 2022), https://www.Tirereview.com/pirelli-increase-prices-plt-Tires/.

[69] Brian Coote, Bridgestone to Increase Consumer Tire Prices in U.S., Canada, Tire Review (Jun. 6, 2022), https://www.Tirereview.com/bridgestone-increase-prices/; https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[70] Christian Hinton, Bridgestone Announces Price Increases up to 15% on Select Tires, Tire Review (Sept. 8, 2022), https://www.Tirereview.com/bridgestone-price-increase-3/.

[71] Samuel Grom, Michelin Introduces Price Increases in Canada, U.S., Tire Review (Dec. 13, 2022), https://www.Tirereview.com/michelin-price-increases/.

to take effect on January 1, 2023.[72]

68.     In the 1st quarter of 2023, Richard J. Kramer, CEO of Goodyear, highlighted that "over the last 2 years, [Goodyear was] up about 30% in revenue per Tire."[73]

69.     Despite Defendants' claims regarding raw material shortages and costs, a spokesman for Bridgestone Tires reported in May 2022 that the company has not experienced any production disruptions. "We monitor all critical raw material sand global logistics closely and do not foresee any impacts to our supply at this time."[74]

### 3.  Defendants tracked their competitors' pricing.

70.     Participants in price fixing cartels commonly monitor the conduct of the co-conspirators. As noted by Gary R. Spratling, a Former Deputy Assistant Attorney General in the Department of Justice's Antitrust Division, who was responsible for investigating and prosecuting international cartels, cartels "have shared a number of common characteristics."[75] On top of agreed-upon volumes, exchanges of otherwise competitively sensitive information, and prices charged to customers, a common characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."

71.     Goodyear admitted that they tracked each other's competitively sensitive pricing and sales information. During the 4th Quarter 2021 earnings call, Darren Wells, Chief Administrative Office of Goodyear, explained, "There are 9 competitors that we tend to track,

---

[72] Samuel Grom, Bridgestone Americas Increases Replacement Tire Prices, Tire Review (Dec. 13, 2022), https://www.Tirereview.com/bridgestone-americas-increased-prices/.
[73] 2023 Q1 Interim Report Earnings Call Transcript, Goodyear (May 5, 2023), https://finance.yahoo.com/news/q1-2023-goodyear-tire-rubber-012653565.html.
[74] Emmet White, How Tire Manufacturers Averted Crisis—And Kept Rolling, Autoweek (May 27, 2022).
[75] Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

and 7 out of the 9 have announced price increases in the first quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."[76]

72.     During a conference call with investors, Darren Wells confirmed that Goodyear was tracking competitor pricing, "we've got to acknowledge that we've got major competitors who have announced 2 or 3 price increases during calendar year '22. And Goodyear, North America has announced one increase of up to 12% on January 1. Now the announcements of our competitors generally have been in lower amounts, but there have been a couple of them that have been double digits. So we have to acknowledge that. And then if we go back to last year, Goodyear announced 3 price increases of up to 8% during 2021. And our major competitors announced 3 or 4 price increases generally as well, some of which were unspecified in amounts, but most of which were in the mid-single digits. Yes. So those are the announcements that we've seen."[77]

73.     Revenue management software made this tracking easier. At an earnings call in 2022, Rich Kramer, president of Goodyear, explained, "Our data analytics enable us to evaluate day-to-day movement in end-market pricing for ourselves and our competitors, giving us a clear picture of where we are relative to the market and maximizing our ability to capture value for our business."[78]

---

[76] Q4 2021 Interim Results Earnings Call Transcript, Goodyear (Feb. 11, 2022), https://seekingalpha.com/article/4486435-goodyear-tire-and-rubber-companys-gt-ceo-rich-kramer-on-q4-2021-results-earnings-call.
[77] Q1 2022 Interim Results Earnings Call Transcript, Goodyear (May 6, 2022), https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.
[78] Q1 2022 Interim Results Earnings Call Transcript, Goodyear (May 6, 2022), https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

74.     One such example of revenue management software is Torqata. Torqata started as an analytic arm of American Tire Distributors, designed to identify and create efficiencies in Tire distribution. The company was spun off in 2020 with a mission to allow manufacturers, distributors, and retailers to use data-driven analytics in improving key areas of business performance. The company's goal is to help its customers quickly respond to market trends to drive more revenue. The company's VP of Business Development, Jill Trotta, has explained that "[m]anufacturers and distributions can capture demand signals to optimize inventory and production."

75.     Torqata benchmarks tire prices at the SKU level for its customers. It "then tracks national and regional trends and recommends to retail clients the types of tires they should stock for their market, the optimum pricing for various SKUs and what manufacturer buying programs would work best for their businesses."[79]

76.     In its Pricing Insights, Torqata touts its ability to assist its customers in revenue and inventory management through analysis of competitors' private information, highlighting that it helps tire manufacturers stop "wasting time calling your competition about pricing":



---

[79] Torqata Data_ Tire makers bullish despite down year _ Tire Business (July 2023).

77.     Lizeo Group sells similar software called Retail Price Pro to Defendants Bridgestone and Continental. The software allows the Defendants to filter hundreds of lines of pricing data by part number, brand, product, size, and speed rating. It then allows its customers to set a pricing strategy based on competitor prices.[80]

78.     While Defendants may use different revenue management software, all such programs allow Defendants to analyze large data sets of competitor pricing information in real time, allowing Defendants to monitor the conspiracy by ensuring prices remain at supracompetitive levels.

**4. Defendants had opportunities to collude at industry events.**

79.     Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. At least throughout the Class Period, the tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Tires, through trade association meetings.

80.     Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"). The USTMA is the national trade association for Tire manufacturers that produce Tires in the United States.

81.     Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA. Alexis Garcin, President and CEO of Michelin North America, serves as USTMA's chairman.[81]

82.     The USTMA holds a number of annual conferences and meetings where

---

[80] Retail Price Pro Software for Tire Dealers, Lizeo Group (Aug. 29, 2023), https://www.lizeo-group.com/en-us/use-case/retail-pricing-software-for-tire-dealers/.
[81] Leadership, U.S Tire Manufacturers Association, https://www.ustires.org/leadership (last visited Mar. 29, 2024).

Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020[82]; October 6, 2021[83]; January 25, 2022[84]; October 6, 2022[85]; April 3–4, 2023[86]; and October 11, 2023[87]. Minutes from these regular meetings are not available to the public.

83.    Defendants also meet biannually at the International Tire Exhibition & Conference, which is the largest U.S. conference in the tire industry and attracts executives from all major tire companies. This conference is held in Akron, Ohio. [88]

84.    Defendants Goodyear and Bridgestone serve on the executive committee of the Tire Society, a not-for-profit organization "with the mission to disseminate knowledge and stimulate the innovation of tires as it pertains to tire science, engineering and technology."[89] The

---

[82] Henry Willis, USTMA makes changes to its director board, Tire Technology International (Aug, 14, 2020), https://www.tiretechnologyinternational.com/news/business/ustma-makes-changes-to-its-director-board.html.

[83] Kim Kleine, U.S. Tire Manufacturers Association Names Bridgestone's Paolo Ferrari as Board Chair, U.S. Tire Manufacturers Association, https://www.ustires.org/us-tire-manufacturers-association-names-bridgestones-paolo-ferrari-board-chair (last visited Mar. 29, 2024).

[84] USTMA Announces Four New Board Members, Modern Tire Dealer (Jan 27, 2022), https://www.moderntiredealer.com/retail/article/11466086/ustma-announces-four-new-board-members.

[85] Kim Kleine, U.S. Tire Manufacturers Association Names Bridgestone's Paolo Ferrari as Board Chair, U.S. Tire Manufacturers Association, https://www.ustires.org/us-tire-manufacturers-association-names-bridgestones-paolo-ferrari-board-chair (last visited Mar. 29, 2024).

[86] USTMA Board of Directors Hold Spring Meeting in Washington, DC, Admits Giti Tire USA as 12th Member Company, https://www.ustires.org/ustma-board-directors-holds-spring-meeting-washington-dc-admits-giti-tire-usa-12th-member-company.

[87] Michelin CEO Named USTMA Chairman, Modern Tire Dealer (Oct. 12, 2023), https://www.moderntiredealer.com/suppliers/article/33013078/michelin-ceo-named-ustma-chairman.

[88] Rubber News, ITEC, Tire Society events highlight 'Tire Week in Akron', Rubber News (Jul. 28, 2022), https://www.rubbernews.com/news/goodyear-michelin-ustma-speakers-itec-tire-society.

[89] Executive Committee, Tire Society, https://www.tiresociety.org/executive-committee/ (last visited Mar. 29, 2024).

Tire Society holds an annual event known as the Conference on Science and Technology.[90] Michelin's Alexis Garcin was a keynote speaker at the 41st Conference on Science and Technology in September of 2022.[91]

85. Additionally, Defendants are all members of The Tire and Rime Association, Inc. ("TRA"). The group's "primary purpose is to establish and promulgate interchangeability standards for tires, rims, valves and allied parts."[92]

86. Lastly, the Tire Industry Association ("TIA") is a non-profit association that organizes two industry wide annual events: the Off-the-Road Tire Conference ("OTR") and the Global Tire Expo ("GTE"). Defendants consistently serve as sponsors at these events. In fact, at the 69th annual OTR Conference, just held on February 21-24, 2024, Defendants Bridgestone and Continental were signature sponsors.[93] At the same event, Defendants Michelin, Goodyear, and Nokian Tyres served conference sponsors.[94] Defendant Bridgestone served as a Gold Sponsor at the 2023 GTE.[95]

87. Furthermore, in 2018, Defendants Goodyear and Bridgestone joined forces to form TireHub LLC, creating "one of the largest tire distribution joint ventures in the United States."[96]

---

[90] Rubber News, ITEC, Tire Society events highlight 'Tire Week in Akron,' Rubber News (Jul. 28, 2022), https://www.rubbernews.com/news/goodyear-michelin-ustma-speakers-itec-tire-society.
[91] *Id.*
[92] The Tire and Rim Association, Inc., https://www.us-tra.org/ (last visited Mar. 29, 2024).
[93] Tire Industry Association, Sponsorship, https://www.tireindustry.org/events/otr/sponsorship/ (last visited Mar. 29, 2024).
[94] *Id.*
[95] Tire Industry Association, 2023 Global Tire Expo, https://www.tireindustry.org/events/gte/ (last visited Mar. 29, 2024).
[96] The Goodyear Tire & Rubber Company, Goodyear, Bridgestone Join Forces to Form U.S. National Tire Distributor, PR Newswire (Apr. 16, 2018) https://www.prnewswire.com/news-releases/goodyear-bridgestone-join-forces-to-form-us-national-tire-distributor-300630525.html.

88.     As a result of this new joint venture, Defendant Goodyear terminated its distribution relationship with American Tires Distributors ("ATD"), further limiting customer options for where to purchase replacement Tires. Stuart Schuette, President and CEO of ATD said, "Unfortunately, Goodyear has chosen to force this transition upon all of us, but we'll work closely with you to manage the impacts…Goodyear is choosing to limit how its customers can purchase and obtain its products."[97]

89.     TireHub gives Bridgestone and Goodyear an additional channel for communicating competitively sensitive information to each other, potentially including non-public pricing and sales volumes information.

### 5.  Supply Coordination

90.     Defendants also began colluding on the supply of Tires in the market.

91.     The decrease in demand led to excess supply in the market by 2022. As a result, Defendants announced decreases in production beginning that year. Goodyear explained that "in order to address softening industry demand and prevent the buildup of excess inventory, we reduced production in the fourth quarter of 2022 at most of our Tire manufacturing facilities, resulting in a reduction of approximately 3.5 million units compared to production in the fourth quarter of 2021."[98]

92.     Various statements by Defendants executives emphasized that this "capacity discipline" had to be exercised collectively by industry members. As Goodyear CEO Richard Kramer, explained at the 2023 1st Quarter earnings call, Goodyear had a  "focus on making sure we're not putting too many Tires in inventory that could impact negatively that supply-demand

---

[97] Madeleine Winer, Goodyear To Discontinue Distribution to ATD, Tire Review (Apr. 23, 2018), https://www.tirereview.com/goodyear-discontinue-distribution-atd/
[98] The Goodyear Tire & Rubber Company, Annual Report 2022 (Form 10-K) at 27.

equation." He further noted that "[t]here's a lot of manufacturing capacity in the industry."[99]

**D.**    **Market Conditions for Tires Are Highly Conducive to Collusion Among Defendants.**

93.    The tire market structure is characterized by numerous "plus factors" that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) inelastic consumer demand, (3) market concentration of sellers, (4) an unconcentrated market of buyers, (5) numerous opportunities to collude.

1.    *There are high barriers to entry.*

94.    Typically, in a market where market participants are colluding to generate supra-competitive prices, the excess profits generated would incentivize competitors to enter the market and drive prices down. However, in markets where there are high barriers to entry, like the market for tires, new competitors are less likely to enter the market. Thus, entry barriers help to facilitate the formation and maintenance of a cartel. Manufacturers of tires face significant entry barriers, such as significant startup and scaling costs, regulatory compliance, high input costs, labor costs, and high cost of research and development to create and introduce new products to the marketplace. Furthermore, any potential newcomer would have to upend the existing relations between that large tire companies and their customers. Thus, new entrants into the market for tires are unlikely to be a real threat to cartel pricing.

95.    These high barriers to entry are amplified by the difficulty purchasers of tires have in switching between manufacturers once a relationship is in place. Smaller suppliers of

---

[99] Insider Monkey Transcripts, The Goodyear Tire & Rubber Company (NASDAQ:GT) Q4 2022 Earnings Call Transcript, Insider Mokey (Feb. 10, 2023), https://www.insidermonkey.com/blog/the-goodyear-tire-rubber-company-nasdaqgt-q4-2022-earnings-call-transcript-1118474/5/

tires cannot quickly build up their scale and capacity for customers who wish to switch providers. Additionally, as tires are heavy products, the manufacturing plants need to be close enough to the end consumers to make shipping costs not prohibitive. These manufacturing plants must either have sophisticated and expensive automation or a large and expensive labor force. Established tire manufacturers have also erected significant intellectual property protections through patented products.

### 2. *There is inelastic consumer demand for tires.*

96.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

97.     There is a lack of substitute goods for tires, and tires are necessary for almost every wheeled vehicle. This leads to demand inelasticity.

98.     This inelasticity is demonstrated by the fact that Defendants' sales volume did not suffer even with dramatic price increases. From 2020, the global Tire market increased 18% year over year in 2021 to around $180 billion.[100] By 2022, demand had returned in line with 2019 levels. For example, Continental's sales volume rose by 19.3% in 2022. Demand increased despite rapid price increases in 2021."[101]

---

[100] Michelin, 2022 Results at 2.
[101] Continental 2022 Annual Report, pg. 73, Continental AG, https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf (last visited Mar. 29, 2024)

99.    Similarly, in 2022, Bridgestone America's chief operating officer reported, "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong." [102]

100.    As ProPublica reported, corporate executives noticed that when they raised prices, consumers continued to purchase their products.[103] These leaders have declared that they will continue to keep prices high. Goodyear's Chief Administrative Officer Darren Wells reiterated in an earnings call that its "increase in the replacement Tire prices more than offset [Goodyear's] costs."[104]

101.    As price increases for tires do not in general reduce the purchase of Tires, or the revenue that Defendants make on their sales of Tires, the tire market is highly susceptible to collusion.

3.  *The market for tires manufacturers is highly concentrated.*

102.    The tires industry is a highly concentrated market where a small number of firms have operated and dominated the industry for decades. The more highly concentrated a market is, the less competitive it tends to become. When a small number of companies dominate and control a given market sector, the market can be described as an oligopoly.

---

[102] Rising tire prices affected by several factors, Tire Business (Jul. 8, 2022), https://www.Tirebusiness.com/news/rising-Tire-prices-affected-several-factors
[103] Michael Grabell, Overinflated: The Journey of a Humble Tire Reveals Why Prices Are Still So High, ProPublica (May 3, 2023), https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices
[104] Q1 2022 Interim Results Earnings Call Transcript, Goodyear (May 6, 2022), https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call

103.    Michelin, Bridgestone, and Goodyear have dominated the market for tires for over 25 years. In 2022, those three companies alone accounted for almost 64% of the entire replacement tire market.[105]



104.    Industry consolidation has occurred which makes it easier for a conspiracy to form as market share is more concentrated. Notable examples of recent consolidation include:

  i.      In 2006, Bridgestone acquired Bandag, Inc., a tire production company.

  ii.     In 2018, Michelin acquired Camso, a leading Canadian tire manufacturer.

  iii.    In 2018, Michelin acquired Fenner PLC, the global leader in reinforced polymer-based products to expand Michelin's offer of tires.

---

[105] Ashley Jefferson, The 'Goliaths' of the Replacement Tire Industry Are Getting Bigger. How Can The 'Davids' Compete?, TraQline (Feb. 14, 2022), https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/

iv.      In 2021, Goodyear acquired Cooper Tire & Rubber Co., the fifth-largest North American tire maker.

**4. *The market of tire purchasers is unconcentrated.***

105.    The purchasing firms that comprise the demand side are mostly independent. Each purchaser, therefore, comprises only a small portion of a Defendant's business. This incentivizes Defendants to abide by the conspiracy's terms rather than make price concessions to a lone purchaser, since foregoing sales to a single purchaser represents an insignificant loss compared to the consequences of violating the conspiracy.

106.    Defendants sell through a variety of sales channels. They sell directly to consumers and through wholly owned retail outlets. They also sell through auto dealerships, mass merchandisers, warehouse clubs, mechanics, and online Tire dealerships as well as directly to vehicle manufacturers.[106]

**5. *There were numerous opportunities for Defendants to collude.***

107.    The DOJ notes that competitors who "know each other well through social connections, trade associations, [and] legitimate business contacts" are more likely to collude.[107]

108.    As noted supra, Defendants are deeply interconnected through their shared membership in U.S. and foreign trade associations.

109.    Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"). The USTMA is the national trade association for tire manufacturers that produce tires in the United States.

110.    Senior executives from each of the Defendants currently serve on the Board of

---

[106] Ibis Word, Tire Manufacturing in the US Industry Report (Jan. 2024) at 36.
[107] Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects, U.S. Department of Justice Antitrust Division, https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding (last visited Mar. 29, 2024)

Directors of the USTMA.

111.    The USTMA holds a number of annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020, October 6, 2021, January 25, 2022, October 6, 2022, April 3–4, 2023, and October 11, 2023.  Minutes from these regular meetings are not available to the public.

112.    As discussed above, Goodyear and Bridgestone partnered in 2018 to create TireHub, a joint venture tire distributor.

6. *Tires are standardized products with a high degree of interchangeability*

113.    Defendants make similar models of tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer tires). Within each type-category, tires do not differ significantly in quality, appearance, or use. As a result, tire models are functionally interchangeable.

114.    When purchasing a new set of replacement tires, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four tires on their vehicle, they can use tires from different brands or models so long as certain features, such as tread depth, are similar.[108] Thus, tire "producers are not likely to be able to deviate much from the competitive price without losing sales."[109]

115.    When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a

---

[108] Agota Szabo, Should You Be Mixing Tire (Brands) on the Same Vehicle, Priority Tire (Jun 17, 2022), https://www.prioritytire.com/blog/should-you-be-mixing-tire-brands-on-the-same-vehicle/.

[109] Economic Analysis of the Rubber Tire Manufacturing MACT, U.S. Environmental Protection Agency (August 2000), at 2-13, https://www.epa.gov/sites/default/files/2020-07/documents/rubber-tire-mfg_ip_08-2000.pdf.

cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product like a tire is interchangeable, economics suggests that cartel behavior is facilitated because cartel members can more easily monitor and detect defections from a price-fixing agreement.

      **E.**    **Antitrust Investigations Support the Existence of a Conspiracy.**

116.    On the morning of January 30, 2024, the European corporate offices of Defendants Michelin, Bridgestone, Continental, Goodyear, Pirelli and Nokian Tyres were raided by the European antitrust authorities as part of an investigation into a suspected price-fixing conspiracy among the Tire manufactures.[110]

117.    Each Defendant has confirmed that their European offices have been raided.[111]

      **F.**    **Defendants are repeat violators of antitrust laws.**

118.    The U.S. tire industry for years has been highly concentrated, and there is a history of antitrust violations by tire manufacturers.

119.    In 2008, the South African Competition Authority conducted search and seizure operations at the premises of Bridgestone, Dunlop, and the South African Tyre Manufacturers' Conference ("SATMC").[112]

120.    The raids resulted in Bridgestone, Goodyear, Continental and Apollo being accused of colluding to fix prices in South Africa. All the companies except Bridgestone were fined 10% of their South Africa sales. Bridgestone was granted conditional immunity in

---

[110]European Commission Press Release, Commission carries out unannounced antitrust inspection in the tyres sector (Jan. 30, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

[111] Bridgestone, Goodyear, Continental, Nokian confirm EU antitrust dawn raids, Mlex Limited(Jan. 30, 2024). https://mlexmarketinsight.com/news/insight/bridgestone-goodyear-continental-nokian-confirm-eu-antitrust-dawn-raids-update

[112] Tyresome collusion: tribunal hearing into alleged tyre cartel, IR Global (Mar. 29, 2022), https://irglobal.com/article/tyresome-collusion-tribunal-hearing-into-alleged-tyre-cartel/.

exchange for its cooperation in the investigation. "'Bridgestone admitted that it held telephonic discussions and met with its competitors during the period 1999 to 2007 to agree in principle that they should cooperate to ensure stability in the market,' the Commission reported."[113]

121. Bridgestone and Pirelli were also named in a complaint involving a conspiracy to fix, raise, maintain or stabilize prices, rig bids, and allocate markets and/or customers for marine hose in 2018.[114] Pirelli ultimately settled that case for millions of dollars and agreed to cooperate with the litigation against its codefendants.[115] In a related criminal case, Bridgestone plead guilty and agreed to pay a $28 million criminal fine.[116] Moreover, Bridgestone agreed to leave the marine hose business entirely.[117]

122. In 2014, Bridgestone agreed to plead guilty and pay a $425 million fine for its role in a conspiracy to fix prices of anti-vibration rubber parts installed in cars sold in the United States and elsewhere.[118]

123. In 2019, Defendants Bridgestone and Continental were amongst the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.[119]

---

[113] Tire Companies Probed in Price Fixing Scheme - Tire Review Magazine (September 2010)
[114] In re Marine Hose Antitrust Litigation, Case No. 1:08-md-018888-DLG, S.D. Fla.
[115] https://www.law360.com/articles/186047/pirelli-settles-marine-hose-antitrust-mdl-for-3m
[116] https://www.justice.gov/opa/pr/bridgestone-corporation-agrees-plead-guilty-participating-conspiracies-rig-bids-and-bribe
[117] https://www.tirereview.com/bridgestone-to-quit-marine-hose-business-due-to-x201c-improper-payments-x201d/
[118] U.S. Department of Justice, Press Release, Bridgestone Corp. Agrees to Plead Guilty to Price Fixing on Automobile Parts Installed in U.S. Cars (Feb. 13, 2014), https://www.justice.gov/opa/pr/bridgestone-corp-agrees-plead-guilty-price-fixing-automobile-parts-installed-us-cars#:~:text=Bridgestone's%20involvement%20in%20the%20conspiracy,Agent%20in%20in%20Charge%20Stephen%20D.
[119] State of California Department of Justice Press Release, Attorney General Becerra Secures $23 Million in Settlements with Auto Parts Manufactures for Violations of Antitrust Law (Dec.

G.        <u>**Defendants Fraudulently Concealed Their Conduct.**</u>

124.    Plaintiffs had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, January 30, 2024, when the EC announced its investigation into the Defendants. As a result, Plaintiffs did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to January 30, 2024, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for Tires.

125.    Therefore, the statute of limitations on the claims asserted herein was tolled by fraudulent concealment until at least January 30, 2024. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

126.    Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiffs reasonably believed it was purchasing Tires in a competitive industry.

127.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in here. Additionally, Defendants falsely attributed price increases to increased input costs during the Class Period.

128.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiffs could not learn or discover the operative facts giving rise to

---

4, 2019), https://oag.ca.gov/news/press-releases/attorney-general-becerra-secures-23-million-settlements-auto-parts-manufacturers.

its claims until January 30, 2024. No information, actual or constructive, was ever made available to Plaintiffs that would have led a reasonably diligent person to investigate whether a conspiracy in the market for Tires existed prior to January 30, 2024.

129.    Moreover, because Plaintiffs could not have discovered the existence of its claims prior to February 1, 2024, Plaintiffs' claims did not accrue until that date.

## CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the following Class (the Nationwide Class):

> **Nationwide Class**: All persons and entities in the United States who, during the Class Period, purchased Tires indirectly from a Defendant for their use and not for resale.

131.    Plaintiffs also brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Damages Class"):

> **Damages Class:** All persons or entities in the Indirect Purchaser States[120] who, during the Class Period, purchased Tires indirectly from a Defendant for their own use and not for resale.

132.    ***Numerosity.*** While Plaintiffs do not know the exact number of members of the Class, given that more than 300 million tires are sold in the United States every year, Plaintiffs believe the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

133.    ***Commonality.*** Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct,

---

[120] The "Indirect Purchaser States" are the states listed in Counts Two and Three.

which was generally applicable to all the members of the Class, thereby making relief with respect

to the Class as a whole appropriate. Such questions of law and fact common to the Class include,

but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of Tires in the United States and its territories;

(b) The identity of the participants of the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated Sections 1 of the Sherman Act;

(e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(f) The effect of the alleged conspiracy on the price of Tires during the Class Period;

(g) Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the members of the Class;

(h) The appropriate injunctive and related equitable relief for Plaintiffs and the Class; and

(i) The appropriate class-wide measure of damages.

134. *Typicality.* Plaintiffs' claims are typical of the claims of the members of the Class,

and Plaintiffs and undersigned counsel will fairly and adequately protect the interests of the Class.

Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in

that they paid artificially inflated prices for Tires from Defendants and/or their co-conspirators.

135. *Adequacy.* Plaintiffs' claims arise out of the same common course of conduct

giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with,

and not antagonistic to, those of the other members of the Class. Plaintiffs are represented by

competent counsel who are experienced in the prosecution of antitrust and class action litigation.

136.    *Predominance.* The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

137.    *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

138.    Billions of dollars of transactions in Tires are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

139.    Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

140.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for tires in

the United States.

141.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of tires sold in the United States, the prices of tires would have been determined by a competitive, efficient market.

## ANTITRUST INJURY

142.    Defendants' antitrust conspiracy had the following effects, among others:

    (a)    Price competition has been restrained or eliminated with respect to the pricing of Tires;

    (b)    The prices of Tires have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    (c)    Purchasers of Tires have been deprived of the benefits of free and open competition; and

    (d)    Purchasers of Tires paid artificially inflated prices.

143.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of Tires.

144.    The Tires that Plaintiffs and Class Members purchased were in substantially the same form as when they were initially sold by Defendants. As a result, the Tires follow a traceable physical chain from Defendants to the Plaintiffs and class members, and the overcharges on Tires can be traced from Defendants to Plaintiffs and class members.

145.    It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge will be felt throughout the distribution chain. As Professor Herbert Hovenkamp, a noted antitrust scholar has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 564:

    A monopoly overcharge at the top of a distribution chain generally results in higher

prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

Similarly, Professor Jeffrey K. McKie-Mason, the Arthur W. Burks Professor of Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan, has stated, it is "well known in economic theory and practice, [that] at least some of the overcharge will be passed on by distributors to end consumers."

146.     Consequently, while the direct purchasers were the first to pay supra-competitive prices, some or all of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and Class Members when they purchased from stores, brokers or distributors.

147.     Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and the class members can be quantified.

148.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for Tires than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF
### Count 1: Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1)
### (Conspiracy in Restraint of Trade)

149.     Plaintiffs repeats and realleges the allegations set forth above as if set forth fully herein.

150. From at least January 1, 2020, until the time that the adverse effects of Defendants' anticompetitive conduct ceased, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to Tires in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

151. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Tires, including surcharges on Tires, in the United States and its territories.

152. In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

(a)    exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of Tires, including surcharges on Tires, sold in the United States and its territories;

(b)    participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of Tires, including surcharges on Tires, sold in the United States and its territories; and

(c)    participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

153. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of Tires, including surcharges on Tires.

154. Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Tires has been restrained, suppressed, and/or eliminated;

(b)    Prices for Tires, including surcharges on Tires, provided by Defendants and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c)     Plaintiffs and members of the Class who purchased Tires from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

155.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for Tires purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

156.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

157.    For this conduct, Plaintiffs and members of the Class are entitled to injunctive relief, and attorneys' fees and costs pursuant to Section 4 of the Clayton Act (15 U.S. Code § 15) and 15 U.S.C. § 26.

### **Count 2: Violation of State Antitrust Statutes**

158.    Plaintiffs' repeats and realleges the allegations set forth above as if set forth fully herein.

159.    During the Class Period, Defendants entered into contracts, combinations, or conspiracies with one another as alleged above, for the purpose and with the effect of artificially raising prices of replacement tires.

160.    The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for tires, including in the United States.

161.    In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of tires purchased by Plaintiffs and members of the Class.

162.    Defendants engaged in the actions described above for the purpose of carrying

out their unlawful agreements to fix, increase, maintain, or stabilize prices of tires. As a direct and proximate result, Plaintiffs and members of the Class were deprived of free and open competition and paid more for tires than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the states included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

163.     Accordingly, Plaintiffs and the members of the Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws. Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

164.     **Arizona**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' conspiracies had the following effects in Arizona: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

165.     **California**: Defendants entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. During the Class Period, Defendants

entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. Each defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of tires at supracompetitive levels. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of tires. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of tires. The combination and conspiracy alleged herein has had, inter alia, the following effects in California: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. In accordance Cal. Bus. & Prof. Code § 16750, Plaintiffs seek monetary relief three times the total damage sustained by all injured persons and their property, the interest on the total damages allowed under Cal. Bus. & Prof. Code § 16761, and the costs of suit including reasonable attorneys' fees.

166.    **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. Ann. § 35-24, *et seq*. Defendants' conspiracies had the following effects in Connecticut: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-24, *et seq*.

167.    **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects in the District of Columbia: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under D.C. Code § 28-4501, *et seq*.

168.    **Hawaii**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' conspiracies had the following effects in Hawaii: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Hawaiian commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief

available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

169.  **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects in Illinois: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

170.  **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects in Iowa: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

171.  **Kansas**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies had the

following effects in Kansas: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq.*

172.    **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects in Maine: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

173.    **Maryland**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq*. Defendants' combinations or conspiracies had the following effects in Maryland: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants'

illegal conduct substantially affected Maryland commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Md. Code Ann., Com. Law § 11-201, *et seq*.

174.  **Michigan**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects in Michigan: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Mich. Comp. Laws § 445.771, *et seq*.

175.  **Minnesota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects in Minnesota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Minn. Stat. § 325D.49, *et seq*.

176.  **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects in Mississippi: (1) price competition for tires was restrained, suppressed,

and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Miss. Code § 75-21-1, *et seq.*

177.  **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq.* Defendants' combinations or conspiracies had the following effects in Nebraska: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq.*

178.  **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.* Defendants' combinations or conspiracies had the following effects in Nevada: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members

of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq*.

179. **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects in New Hampshire: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

180. **New Mexico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects in New Mexico: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

181. **New York**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*. (Donnelly Act).

Defendants' combinations or conspiracies had the following effects in New York: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

182. **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects in North Carolina: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

183. **North Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects in North Dakota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and

stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq*.

184. **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects in Oregon: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

185. **Rhode Island**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects in Rhode Island: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants'

illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq.*

186.    **South Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects in South Dakota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37- 1-3.1, *et seq.*

187.    **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq.* Defendants' combinations or conspiracies had the following effects in Tennessee: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, *et seq.*

188. **Utah**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combinations or conspiracies had the following effects in Utah: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

189. **Vermont**: Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq*. Defendants' combinations or conspiracies had the following effects in Vermont: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann.§ 2465, *et seq*.

190. **West Virginia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq*. Defendants' combinations or conspiracies had the following effects in West Virginia: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and

stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

191. **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects in Wisconsin: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, *et seq*.

### Count 3: Violation of Consumer Protection Statutes

192. Plaintiffs' **repeats** and realleges the allegations set forth above as if set forth fully herein.

193. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

194. **Alaska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.

Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which tires at issue was sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects in Alaska: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and tire purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

195.    **California**: Defendants have engaged in unfair competition or unfair, unlawful, and/or fraudulent acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed Tires in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq.*, by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and

nondisclosures of Defendants, as alleged herein, constituted a common and continuous, course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq*., are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of tires in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially inflated prices for tires. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200, *et seq*. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

196.  **Colorado**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential purchasers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects in Colorado: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and purchasers of tires. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6- 1-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

197.  **Florida**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects in Florida: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Fla. Stat. § 501.201, *et seq*.

198.    **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as a purchaser of the Defendants' goods, and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class. Defendants' unlawful conduct had the following effects in Minnesota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and tire purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

199.    **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects in Nebraska: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire

prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants marketed, sold, or distributed tires in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and tire purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

200.    **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold tires in New Hampshire and deceived Plaintiffs and Damages Class Members in New Hampshire into believing that the tires were competitively priced. Defendants' unlawful conduct had the following effects in New Hampshire: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants marketed, sold, or distributed tires in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and tires purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. 46 Stat. § 358- A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available

under that statute.

201. **New Mexico**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*. In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing tires because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of tires, including their illegal conspiracy to secretly fix the price of tires at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. Defendants' unlawful conduct had the following effects in New Mexico: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened

with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

202. **New York**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which tires were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their coconspirators made public statements about the prices of tires that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for tires; and Defendants alone possessed material information that was relevant to consumers but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased tires were misled to believe that they were paying a fair price for tires or the price increases for tires were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing tires would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing tires would have a broad impact, causing business class members who indirectly purchased tires to be injured by paying more for tires than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349,

which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of customers business that purchase tires in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects in New York: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants marketed, sold, or distributed tires in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed tires in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

203.    **North Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Tires were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants publicly provided pretextual

and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to commercial and institutional indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers and commercial and institutional indirect purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects in North Carolina: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants marketed, sold, or distributed tires in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates, dominated and controlled, manufactured, sold and/or distributed tires in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

204. **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to,

and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Tire at issue was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for tires. Defendants misrepresented to all purchasers during the Class Period that Defendants' tire prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and tires purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing tires at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

205. **Rhode Island**: Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which tires were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for tires. Defendants owed a duty to disclose such facts and considering the relative lack of sophistication of the average, nonbusiness purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' tires prices were competitive and fair. Defendants' unlawful conduct had the following effects in Rhode Island: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including businesses that purchase tires. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of them Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of tires, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing tires at prices set

by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

206.   **South Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects in South Carolina: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

207.   **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting,

fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which tires were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for tires. Defendants misrepresented to all purchasers during the Class Period that Defendants' tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in South Dakota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. Defendants' illegal conduct substantially affected South Dakota commerce and those who purchased tires in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing tires at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

208. **Vermont**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which tires were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for tires. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' tire prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of tires, likely misled all commercial and institutional indirect purchasers acting reasonably under the circumstances to believe that they were purchasing Tires at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

209. **West Virginia**: Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Tires at issue were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for tires. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in West Virginia: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of tires. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing tires at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the tires they purchased. Defendants have

engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

210.   **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wis. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which tire were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in Wisconsin: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of tires. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing tires at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information

important to Plaintiffs and members of the Damages Class as they related to the cost of tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. §100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class respectfully request the following relief:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been (a) an unreasonable restraint of trade or commerce in violation of violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; and (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein;

C.     That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

D.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

E.      That the Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: April 18, 2024


Respectfully submitted,

*/s/ Michelle L. Kranz*

Michelle L. Kranz (0062479)
**ZOLL & KRANZ, LLC**
6620 W. Central Ave., Suite 100
Toledo, OH 43617
Tel: (419) 841-9623
Fax: (419) 841-9719
Email: michelle@toledolaw.com

Timothy D. Battin
Christopher V. Le
Joshua Q. Callister
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@boiesbattin.com
cle@boiesbattin.com
jcallister@boiesbattin.com

Daniel Zemans
**Law Offices of Daniel Zemans, LLC**
2023 W. Berteau Ave.
Chicago, IL 60618
Phone: (773) 706-7767
Email: dzemans@zemans-law.com

*Counsel for Plaintiffs and the Putative Class*